## SCOTT *v.* DEWEESE.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 148. Argued January 24, 25, 1901.—Decided April 15, 1901.

Section 5142 of the Revised Statutes of the United States, providing for the increase of the capital stock of a national bank, and declaring that no increase of capital stock shall be valid until the whole amount of the increase is paid in, and until the Comptroller of the Currency shall certify that the amount of the proposed increase has been duly paid in as part of the capital of such association, does not make *void* a subscription or certificate of stock based upon capital stock actually paid in, simply because the whole amount of any proposed or authorized increase has not in fact been paid into the bank; certainly, the statute should not be so applied in behalf of a person sought to be made liable as shareholder, when, as in the present case, he held, at the time the bank suspended and was put into the hands of a receiver, a certificate of the shares subscribed for by him; enjoyed, by receiving and retaining dividends, the rights of a shareholder; and appeared as a shareholder upon the books of the bank, which were open to inspection, as of right, by creditors.

As between the bank and the defendant, the latter having paid the amount of his subscription for shares in the proposed increase of capital was entitled to all the rights of a shareholder, and therefore, as between himself and the creditors of the bank, became a shareholder to the extent of the stock subscribed and paid for by him.

That the bank, after obtaining authority to increase its capital, issued certificates of stock without the knowledge or approval of the Comptroller and proceeded to do business upon the basis of such increase before the

whole amount of the proposed increase of capital had been paid in, was
a matter between it and the Government under whose laws it was organ-
ized, and did not render void subscriptions or certificates of stock based
upon capital actually paid in, nor have the effect to relieve a shareholder,
who became such by paying into the bank the amount subscribed by him,
from the individual liability imposed by section 5151.

Upon the failure of a national bank the rights of creditors attach under sec-
tion 5151, and a shareholder who was such when the failure occurred can-
not escape the individual liability prescribed by that section upon the
ground that the bank issued a certificate of stock before, strictly speak-
ing, it had authority to do so.

If a subscriber to the stock of a national bank becomes a shareholder in con-
sequence of frauds practiced upon him by others, whether they be officers
of the bank or officers of the Government, he must look to them for such
redress as the law authorizes, and is estopped, as against creditors, to
deny that he is a shareholder, within the meaning of section 5151, if at the
time the rights of creditors accrued he occupied and was accorded the
rights appertaining to that position.

THE case is stated in the opinion of the court.

*Mr. Hiram F. Stevens* for plaintiff in error. *Mr. C. N.
Sterry, Mr. Eugene Hagen* and *Mr. I. E. Lambert* by leave of
court filed a brief on that side.

*Mr. William S. Shirk* for defendant in error.

MR. JUSTICE HARLAN, delivered the opinion of the court.

This case went off in the Circuit Court upon a motion for a
judgment in favor of the plaintiff upon the pleadings. The
motion was sustained and judgment was entered in accordance
with the prayer of the petition. That judgment was affirmed
in the Circuit Court of Appeals, Judge Sanborn dissenting. 89
Fed. Rep. 843, 856; 60 U. S. App. 720, 743. The case is here
upon writ of error sued out by the defendant Scott.

The case made by the petition is substantially as follows:

The First National Bank of Sedalia, Missouri, was organized
on the 30th of October, 1865, with a capital stock of $100,000
and thereafter, until the 24th day of October, 1885, continued
to do a banking business.

On the day last named the bank, pursuant to the provisions of

the act of Congress approved July 12, 1882, 22 Stat. 162, c. 290, extended the period of its succession for a term of twenty years from and after the 30th of October, 1885; and on the 24th of October, 1885, the Comptroller of the Currency issued his certificate stating that the bank had complied with the provisions of the act of Congress in thus extending the period of its existence, and was authorized to have succession until the close of business on the 30th of October, 1905.

On the 6th of September, 1890, the bank increased its capital stock in the sum of $150,000; and on the 17th of January, 1891, the Comptroller of the Currency certified that it had increased its stock to the above extent in accordance with the provisions of the act of May 1, 1886, 24 Stat. 18, c. 73, and that such increase was approved; also, that the increase had been duly paid in as part of the capital stock of the company.

The bank continued to do a banking business upon the basis of a capital stock of $250,000 until the 4th day of May, 1894, on which day it became insolvent, closed its doors, and ceased to do business.

On the 10th of May, 1894, the original plaintiff, W. A. Latimer, was duly appointed receiver of the bank by the Comptroller of the Currency under the laws relating to national banking associations. The defendant in error Deweese was after that date substituted in his place as receiver.

In winding up and settling the affairs of the bank the Comptroller of the Currency determined that it was necessary to enforce the individual liability of stockholders and to collect from them an amount equal to 75 per cent of their stock at par value; and on the 13th day of April, 1895, that officer made an assessment and requisition upon shareholders for the sum of $187,500, to be paid by them ratably on or before the 15th day of May, 1895, and made demand upon the defendant Scott for $75 upon every share of the capital stock of the bank held or owned by him at the time of the failure of the bank as above stated, payable on or before the 15th day of May, 1895. The receiver was directed to enforce against shareholders the payment of the amounts assessed against them.

At the time of the failure and suspension of the bank the de-

fendant Scott was the owner and holder of fifty shares of its capital stock of the par value of $100 each. The amount ratably due by him as such shareholder under the above assessment was $3750.

On the 17th day of April, 1895, the receiver of the bank notified the defendant of the assessment and requisition and demanded payment of the same; but he did not pay that sum or any part thereof. Hence this action.

Judgment was asked for the sum of $3750, with interest from May 15, 1895, as well as for costs of suit.

The defendant in his answer admitted the organization of the bank and the extension of the period of its incorporation as alleged; also that the bank continued to do a banking business as set out in the petition, and that it had become insolvent and closed its doors. He also admitted the appointment and qualification of the receiver and the allegations of the petition as to the order of the Comptroller of the Currency.

Further answering, he alleged, that on September 6, 1890, the bank by a vote of the owners of two thirds of its capital stock, voted to increase that stock in the sum of $150,000; that it notified the Comptroller that the whole amount of such increase had been paid in; that on January 17, 1891, that officer—then knowing that more than the entire capital of the bank was loaned, directly and indirectly, to its president, and that the amount so loaned had been steadily increased for several years up to the date just named by adding the interest which was not paid to the notes evidencing the loans or the renewals thereof, and who based his action wholly upon the notification from the bank—issued a certificate stating that the amount of the increase of capital was $150,000, that the same was paid in, and that such increase was approved; that thereafter, until May 24, 1894, the bank continued to do business with a pretended capital of $250,000;

That "in September, 1890, the officers of said bank informed and represented to defendant as follows: That said bank contemplated increasing its capital stock from one hundred thousand dollars to two hundred and fifty thousand dollars; that said intended increase of capital was made desirable on account

of the increasing business of said bank; that said bank was in a flourishing condition and earning large dividends upon its capital stock, and then had a surplus of fifty thousand dollars over and above its capital stock and all liabilities; that from said surplus such dividends would be declared as would make each of the two thousand five hundred shares of stock worth the sum of one hundred and eight dollars;"

That relying upon such representations the defendant—never having held or owned any stock in the bank—subscribed for fifty shares of the proposed increase of $150,000, and in October, 1890, deposited in the bank the sum of $5400;

That it was the understanding between the defendant and the bank that that sum was to be held by it and applied in payment of defendant's subscription for fifty shares, when all of the proposed increase was subscribed and the money therefor paid into the bank, "and the issues of the shares of said increase could be legally made;".

That the bank gave to the defendant a receipt for said sum of $5400, and about October 25, 1890, delivered to him a certificate for fifty shares of "its said pretended increase of capital;" and,

That the "bank then, falsely and fraudulently and with intent to deceive defendant, represented to defendant that the said increase of capital had been lawfully made, and that the full amount thereof had been subscribed for and paid in in full, and defendant, deceived by said representations, and relying thereon, accepted and retained said certificate, and that defendant held and claimed as owner said certificate thereafter and until the closing of said bank, and in the years 1891 and 1892 received and retained alleged dividends aggregating eighteen per cent of the par value of said certificate; that said alleged dividends were paid out of the money paid as aforesaid by defendant to said bank."

The defendant further alleged that in September, 1890, and for many months prior thereto and afterwards, the bank was in fact wholly insolvent, had no surplus whatever, and at the time of the increase of the stock all of its capital had been lost its liabilities irrespective of its capital stock and alleged sur-

plus exceeding its assets—and it was earning no dividends upon its capital;

That said pretended increase of stock was never of any value or validity whatever; that only about *two thirds of the increased stock was ever paid;* that the officers of the bank made false entries in its books and records for the purpose of showing an apparent surplus, and declaring a dividend to themselves therefrom, turning the dividends into the bank in pretended payment for a large part of the increased stock;

That the whole transaction was a sham for the purpose of bolstering up an insolvent institution by obtaining large sums of money from the subscribers for the increased stock, and for the further purpose of " watering" its capital stock and permitting its officers to appropriate to themselves, without paying anything therefor, a large part of such pretended increase, of all of which defendant had no knowledge whatever until long after the bank had closed its doors on May 4, 1894, nor had defendant any information whatever that could in any way have created a suspicion thereof;

That the books and records of the bank during all the time after October 25, 1890, had shown, and it had been made by them to appear, that all of the pretended increase of capital was paid in; and that from a time prior to the last-named date until the bank closed its books and records were systematically, skilfully and cunningly falsified by its officers, and so kept that the defendant could not by the utmost diligence have ascertained the true condition of the bank; and,

That as soon as he discovered that the increased stock was not fully paid in, defendant disclaimed and denied that he was or ever had been a stockholder of the bank.

Such being the case made by the pleadings, we are to inquire whether there was error in giving judgment against the defendant.

By section 5151 of the Revised Statutes, " the shareholders of every national banking association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts and engagements of such association, to the

extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares."

Within the meaning of that section, was the defendant, in view of the facts stated in the pleadings, to be deemed a shareholder of the bank when it suspended and was put into the hands of a receiver?

The defendant admits in his answer that he held, and for three years and more previous to that date had held, a certificate for fifty shares of the bank's stock, and exercised the rights of a shareholder by receiving dividends for the years 1891 and 1892 aggregating eighteen per cent of the par value of the stock standing in his name on the book of the association. He thus enjoyed the privileges of a shareholder.

The defendant, however, contends that although he may have exercised the rights of a shareholder in holding a certificate of shares and in receiving and retaining dividends, he was not a shareholder within the meaning of section 5151 so as to become individually liable, to the extent prescribed by that section, for the contracts, debts and engagements of the bank.

That position is supposed to be justified by section 5142 of the Revised Statutes declaring that "any association formed under this Title may, by its articles of association, provide for an increase of its capital from time to time, as may be deemed expedient, subject to the limitations of this Title. But the maximum of such increase to be provided in the articles of association shall be determined by the Comptroller of the Currency; and no increase of capital shall be valid until the whole amount of such increase is paid in, and notice thereof has been transmitted to the Comptroller of the Currency, and his certificate obtained specifying the amount of such increase of capital stock, with his approval thereof, and that it has been duly paid in as part of the capital of such association." That section was modified, in some respects, by the act of May 1, 1886, c. 73, which provided "that any national banking association may, with the approval of the Comptroller of the Currency, by the vote of shareholders owning two thirds of the stock of such association, increase its capital stock, in accordance with existing laws, to any sum approved by the said Comptroller, notwith-

standing the limit fixed in its original articles of association and determined by said Comptroller; and no increase of the capital stock of any national banking association either within or beyond the limit fixed in its original articles of association shall be made except in the manner herein provided." Under this last statute the bank proceeded when by the vote of two thirds of its shareholders it determined to increase its stock by $150,000. 24 Stat. 18, § 1.

The defendant lays great stress on the words in section 5142, "no increase of capital shall be valid until the whole amount of such increase is paid in," and until the Comptroller shall certify that the amount of the proposed increase "has been duly paid in as part of the capital of such association." But does it follow that one who claimed to be a shareholder in respect of an increase of the bank's capital, and who was recognized as such by the bank, particularly if he held a formal certificate stating that he was a shareholder, can escape liability, under section 5151, by simply proving—after the bank has suspended and has been placed into the hands of a receiver—that the *whole* amount of the proposed increase was not in fact "paid in" as required by section 5142, although the contrary was certified by the Comptroller upon the bank's report to that officer? We think not.

The literal construction insisted upon by the defendant might produce results which we cannot suppose were ever contemplated by Congress. Referring to that construction the court below well said: "If this contention is well founded, then, as already said, it follows that if all the shares but one had been subscribed and paid for, nevertheless the holders of the certificates for the full-paid shares could not be heard to assert that they were the owners of valid shares, which would be a most unjust result. If this is the true meaning of the statute, it is made possible for parties in control of a national bank, with the approval of the Comptroller, to authorize the increase of the capital stock, to obtain subscription and payment in full for all the shares but one or two, and then, if that be desirable, to deny to the holders of these full-paid certificates, any participation in the control of the bank, or in case the bank becomes insolvent,

to shield these holders of certificates from liability to creditors. Certainly a construction of the statute having such results should not be adopted unless the statute as a whole imperatively demands it."

The primary object of the provision that "no increase of capital shall be valid until the whole amount of such increase is paid in" was to prevent the "watering" of stock, that is, prevent banking business being done upon the basis of an increased capital which did not in fact exist. If this prohibition be disregarded by a national bank, the conduct of its business could no doubt be controlled by the representatives of the Government so far as might be necessary to compel obedience to the law. Rev. Stat. § 5205. But the statute does not, in terms, make *void* a subscription or certificate of stock based upon increased capital stock actually paid in, simply because the whole amount of any proposed or authorized increase has not in fact been paid into the bank. Certainly, the statute should not be so applied in behalf of a person sought to be made liable as a shareholder, when, as, in the present case, he held, at the time the bank suspended and was put into the hands of a receiver, a certificate of the shares subscribed for by him; enjoyed, by receiving and retaining dividends, the rights of a shareholder; and appeared as a shareholder upon the books of the bank which were open to inspection, as of right, by creditors. Rev. Stat. § 5210. As between the bank and the defendant, the latter having paid the amount of his subscription for shares in the proposed increase of capital was entitled to all the rights of a shareholder, and therefore, as between himself and creditors of the bank, became a shareholder to the extent of the stock subscribed and paid for by him. That the bank, after obtaining authority to increase its capital, issued certificates of stock without the knowledge or approval of the Comptroller and proceeded to do business upon the basis of such increase before the whole amount of the proposed increase of capital had been paid in, was a matter between it and the Government under whose laws it was organized, and did not render void subscriptions or certificates of stock based upon capital actually paid in, nor have the effect to relieve a

shareholder, who became such by paying into the bank the amount subscribed by him, from the individual liability imposed by section 5151.

In *National Bank* v. *Matthews*, 98 U. S. 621, 629, it appeared that a national bank had made a loan of money, the repayment of which by the borrower was in part secured by a deed of trust on real estate. The borrower insisted that the taking of the deed of trust as security was in violation of the act of Congress. This court conceded that the statute by clear implication forbade a national bank from making a loan on real estate security, but held that the violation of the statute by the bank was a matter of which the borrower could not complain, saying: " We cannot believe it was meant that stockholders, and perhaps depositors and other creditors, should be punished and the borrower rewarded, by giving success to this defence whenever the offensive act shall occur. The impending danger of a judgment of ouster and dissolution was, we think, the check, and none other contemplated by Congress. That has been always the punishment prescribed for the wanton violation of a charter, and it may be made to follow whenever the proper public authority shall see fit to invoke its application. A private person cannot, directly or indirectly, usurp this function of the Government." The doctrine of the *Matthews* case has been often reaffirmed. *Whitney* v. *Wyman*, 101 U. S. 392, 397; *Jones* v. *Guaranty and Indemnity Co.*, 101 U. S. 622, 628; *Fritts* v. *Palmer*, 132 U. S. 282, 291; *Logan County Nat. Bank* v. *Townsend*, 139 U. S. 67, 76; *Thompson* v. *St. Nicholas Nat. Bank*, 146 U. S. 240, 251.

By section 5201 of the Revised Statutes it is provided that " no association shall make any loan or discount on the security of the shares of its own capital stock, nor be the purchaser or holder of any such shares, unless such security or purchase shall be necessary to prevent loss upon a debt previously contracted in good faith; and stock so purchased or acquired shall, within six months from the time of its purchase, be sold or disposed of at public or private sale; or, in default thereof, a receiver may be appointed to close up the business of the association." " While this section," this court said in *National*

*Bank of Xenia* v. *Stewart,* 107 U. S. 676, 677, " in terms pro-
hibits a banking association from making a loan upon the se-
curity of shares of its own stock, it imposes no penalty, either
upon the bank or borrower, if a loan upon such security be
made. If, therefore, the prohibition can be urged against the
validity of the transaction by any one except the Government,
it can only be done before the contract is executed, while the
security is still subsisting in the hands of the bank. It can,
then, if at all, be invoked to restrain or defeat the enforcement
of the security. When the contract has been executed, the
security sold, and the proceeds applied to the payment of the
debt, the courts will not interfere with the matter. Both bank
and borrower are in such case equally the subjects of legal cen-
sure, and they will be left by the courts where they have placed
themselves."

These principles are in our judgment applicable to the case
before us.

The defendant alleged that he subscribed for the fifty shares
of the proposed increase of the bank's capital and deposited in
the bank the amount necessary to pay for the stock, upon an
understanding with the bank that the amount so deposited
should be applied in payment of his subscription when all of
the proposed increase of capital had been subscribed for and
paid in, so that shares based upon such increase could be legally
issued. But this does not present the whole case. The defend-
ant, having paid in the amount subscribed, subsequently ac-
cepted a certificate for the shares subscribed for by him,
knowing, as he must be conclusively presumed to have known,
that the money paid in by him was the basis of such certificate.
He assumed the position, and claimed and exercised the rights,
of a shareholder. He drew money from the bank as dividends
upon his stock. No understanding which the defendant may
have had with the officers of the bank prior to his completed
subscription of stock could, under the circumstances disclosed,
relieve him from the liability attaching to him as a shareholder,
after he had, in the most unequivocal manner, claimed and was
accorded by the bank the rights of a shareholder. It may be—
although upon this question we express no opinion—that the

defendant, by proper proceedings instituted in good faith and in due time before the suspension of the bank, could have had his subscription cancelled upon the ground that the whole amount of the proposed increase of capital had not in fact been paid in, although according to the pleadings the contrary was certified by the Comptroller. But immediately upon the failure of the bank the rights of creditors attached under section 5151, and a shareholder who was such when the failure occurred could not escape the individual liability prescribed by that section upon the ground that the bank had issued to him a certificate of stock before, strictly speaking, it had authority to do so. We concur with the Circuit Court of Appeals in holding that under section 5142, as modified by the act of May 1, 1886, each subscription for portions of increased capital " when paid up in full becomes valid and binding until the maximum is reached, and the statute does not incorporate into such subscriptions a condition that the subscriber paying such subscription in full cannot become a holder of valid stock unless the maximum amount of the proposed increase is subscribed and paid for." If this be a sound view, as we think it is, it follows that one holding stock in a national bank which is so far valid as to entitle him to enjoy, and who is accorded the right to enjoy, the privileges of a shareholder, as against the bank, is a shareholder upon whom assessments may be made in conformity with section 5151.

The present suit is primarily in the interest of creditors of the bank. It is based upon a statute designed not only for their protection but to give confidence to all dealing with national banks in respect of their contracts, debts and engagements, as well as to stockholders generally. If the subscriber became a shareholder in consequence of frauds practised upon him by others, whether they be officers of the bank or officers of the Government, he must look to them for such redress as the law authorizes, and is estopped, as against creditors, to deny that he is a shareholder, within the meaning of section 5151, if at the time the rights of creditors accrued he occupied and was accorded the rights appertaining to that position.

Although this question has not arisen in any former case in

the precise form in which it is here presented, the views we have expressed are in line with former adjudications.

In *Aspinwall* v. *Butler*, 133 U. S. 595, 607, 609, the principal question was as to the liability under section 5151 of one who had subscribed and paid for a part of an authorized increase of the stock of a national bank, the whole amount of such increase not having been taken up by subscriptions. Referring to a by-law of the association relating to the power of the directors when there was a deficiency in subscriptions arising from the failure of some to take stock who had the privilege of doing so, the court, speaking by Mr. Justice Bradley, said: "There was no express condition that the individual subscriptions should be void if the whole $500,000 was not subscribed; and, in our judgment, there was no implied condition in law to that effect. Each subscriber, by paying the amount of his subscription, thereby indicated that it was not made on any such condition. It is not like the case of creditors signing a composition deed to take a certain proportion of their claims in discharge of their debtor. The fixed amount of capital stock in business corporations often remains unfilled, both as to the number of shares subscribed, and as to payment of instalments; and the unsubscribed stock is issued from time to time as the exigencies of the company may require. The fact that some of the stock remains unsubscribed is not sufficient ground for a particular stockholder to withdraw his capital. There may be cases in which equity would interfere to protect subscribers to stock where a large and material deficiency in the amount of capital contemplated has occurred. But such cases would stand on their own circumstances. It could hardly be contended that the present case, in which more than ninety-two per cent of the contemplated increase of capital was actually subscribed and paid in, would belong to that category. In *Minor* v. *Mechanics' Bank of Alexandria*, 1 Pet. 46, only $320,000 out of $500,000 of capital authorized by the charter was subscribed in good faith, but the court did not regard this deficiency in the subscriptions as at all affecting the status of the corporation, or the validity of its operations. Some reliance is placed upon the words of the act of Congress which authorizes an increase of capital within

the maximum prescribed in the articles of association. They are found in section 5142 of the Revised Statutes, which declares that any banking association may, by its articles, provide for an increase of its capital from time to time, but adds, ' no increase of capital shall be valid until the whole amount of such increase is paid in, and notice thereof has been transmitted to the Comptroller of the Currency, and his certificate obtained specifying the amount,' etc. This clause would have been violated by an issue of $500,000 of new stock, when only $461,300 was paid in; but not by an issue of the exact amount that was paid in. The clause in question was intended to secure the actual payment of the stock subscribed, and so as to prevent what is called watering of stock. In the present case the statute was strictly and honestly complied with. The argument of the defendant asks too much. It would apply to the original capital of a company as well as to an increase of capital. And will it do to say, after a company has been organized and gone into business, and dealt with the public, that its stockholders may withdraw their capital and be exempt from statutory liability to creditors, if they can show that the capital stock of the company was not all subscribed?" Again: " The stock was lawfully created, the defendant subscribed for the shares in question and paid for them, and received his certificate; and nothing was afterwards done by the directors, the Comptroller of the Currency, or the stockholders in meeting assembled, which they had not a perfect right to do. The defendant became a stockholder; he held the shares in question when the bank finally went into liquidation; and, of course, became liable under section 5151 of the Revised Statutes to pay an amount equal to the stock by him so held."

In *Pacific National Bank* v. *Eaton*, 141 U. S. 227, 233, 234, the court, again speaking by Mr. Justice Bradley, said : " The defendant in error was just as much bound by her subscription to the new stock as if the whole $500,000 had been subscribed and paid in. The only question to be considered, therefore, is whether the fact that the defendant in error did not call for and take her certificate of stock made any difference as to her status as a stockholder. We cannot see how it could make the

slightest difference. Her actually going or sending to the bank and electing to take her share of the new stock, and paying for it in cash, and receiving a receipt for the same in the form above set forth, are acts which are fully equivalent to a subscription to the stock in writing, and the payment of money therefor. She then became a stockholder. She was properly entered as such on the stock book of the company, and her certificate of stock was made out ready for her when she should call for it. It was her certificate. She could have compelled its delivery had it been refused. Whether she called for it or not was a matter of no consequence whatever in reference to her rights and duties. The case is not like that of a deed for lands, which has no force, and is not a deed, and passes no estate, until it is delivered. In that case everything depends on the delivery. But with capital stock it is different. Without express regulation to the contrary, a person becomes a stockholder by subscribing for stock, paying the amount to the company or its proper officer, and being entered on the stock book as a stockholder. He may take out a certificate or not, as he sees fit. Millions of dollars of capital stock are held without any certificate; or, if certificates are made out, without their ever being delivered. A certificate is authentic evidence of title to stock; but it is not the stock itself, nor is it necessary to the existence of the stock. It certifies to a fact which exists independently of itself. An actual subscription is not necessary. There may be a virtual subscription, deducible from the acts and conduct of the party." To the same effect was *Thayer* v. *Butler*, 141 U. S. 234.

It is supposed that *Concord First National Bank* v. *Hawkins*, 174 U. S. 364, 372, is in opposition to the views herein expressed. We do not think so. In the case referred to it appeared that the bank, located at Concord, New Hampshire, purchased, for purposes of investment, one hundred shares of the stock of the Indianapolis National Bank, doing business at Indianapolis, Indiana, and after such purchase appeared upon the books of the latter bank as the owner and holder of the shares so purchased. The bank at Indianapolis suspended and was put into the hands of a receiver. The question presented was whether,

in respect of the stock standing in its name, the bank in New Hampshire could be held as a shareholder in the other bank under section 5151. This court, following the decisions in prior cases, including *California Bank* v. *Kennedy*, 167 U. S. 362, 367, held that a national bank had no power or authority to invest its surplus funds in the stock of another national bank. It was also adjudged that in the case of such a purchase the purchasing bank could plead its want of power, and thereby protect itself against the liability imposed upon shareholders by section 5151. The court said: "If the previous reasoning be sound, whereby the conclusion was reached that, by reason of the limitations and provisions of the national banking statutes, it is not competent for an association organized thereunder to take upon itself, for investment, ownership of such stock, no intention can be reasonably imputed to Congress to subject the stockholders and creditors thereof, for whose protection those limitations and provisions were designed, to the same liability by reason of a void act on the part of the officers of the bank, as would have resulted from a lawful act. It is argued, on behalf of the receiver, that the object of the statute was to afford a speedy and effective remedy to the creditors of a failed bank, and that this object would be defeated in a great many cases if the Comptroller were obliged to inquire into the validity of all the contracts by which the registered shareholders acquired their respective shares. The force of this objection is not apparent. It is doubtless within the scope of the Comptroller's duty, when informed by the reports of the bank that such an investment has been made, to direct that it be at once disposed of, but the Comptroller's act in ordering an assessment, while conclusive as to the necessity for making it, involves no judgment by him as to the judicial rights of the parties to be affected. While he, of course, assumes that there are stockholders to respond to his order, it is not his function to inquire or determine what, if any, stockholders are exempted."

The difference between that case and the present one is apparent. In the case before us there was no want of power in the defendant to subscribe for stock in the bank at Sedalia

and to assume the position of a shareholder. An individual may become a shareholder in a national bank by his own voluntary act. He can, if he choose, so act as to be estopped from saying that he is not a shareholder and liable as such for the contracts, debts and engagements of the bank. But a national bank is without authority to use its funds for the purchase of the stock of another national bank merely for purposes of investment, and therefore, as held in the *Hawkins* case, it could not under such circumstances become a shareholder within the meaning of section 5151. Of the powers of a national bank under the statutes providing for their creation every one must take notice. Whether a national bank may not be deemed a shareholder, within the meaning of section 5151, if it holds shares of another bank as security for previous indebtedness, is a question suggested in former cases, but not decided, and upon which, in this case, no opinion need be expressed.

The judgment is

*Affirmed.*